## United States Bankruptcy Court
## for the Southern District of Iowa

| | |
|---|---|
| In re:<br><br>Vernon Paul Varner and Lynda K. Topp Varner | Case No. 09-03857-lmj<br><br>Chapter 7 |
| Vernon Paul Varner and Lynda K. Topp Varner,<br><br>Plaintiffs,<br><br>v.<br><br>United Sates of America,<br><br>Defendant. | Adv. Pro. No. 09-30121-lmj |

### Plaintiffs' Reply to United States Trial Brief

**Issue for Decision**

First issue and throughout this brief will be to correct the prior filed trial brief of April 21, 2011 by U.S. Attorney Curtis Weidler. I pray the court will review as presented by this brief which is submitted with real numbers. In that context of the factors and issues existent in 1998, 1999, 2000, 2001 and 2002. Not as in the defendant's brief, which is completely dependent on mere assumptions of maybe(s) 2003. Assumptions in error, even the numbers of dollars of "owed taxes", are in error by a factor of three. As well, outright statements that conflict with my deposition under oath giving my consent to Mr. Weidler to contact, interview and receive any records needed from all my accountants

1

RCIASB 06/23/11 15:37

and attorneys, 1) McGladrey's, my accountants from August 11, 1980 to mid 2005, 2) my tax attorney-Ronald Mountsier, 3) my business attorney-William Graham. I had contacted them all before my 2009 deposition and then again afterwards. Mr. Weidler, counsel for defense, did not do so. That as fact, recently confirmed. Available to Mr. Weidler for the labor of a simple request: 1) full civil pleading for two civil actions, 2) many depositions, 3) fact based time lines extending from before 1995 to 2009, 4) spreadsheets as exhibits, 5) actual tax returns. The same as I will provide to the court as exhibits. I had instructed the above named people to reach out to provide and bend over backwards to assist Mr. Weidler in any way he needed. I was aware, and remain convinced that the facts and issues were complex and many factors determined how monies I earned were spent.

Of remarkable importance: 1) Business fraud, 2) Tax fraud, 3) Insurance fraud, 4) Identity theft. And the theft of funds, in addition, completed tax forms indicating payment of withholding taxes to the IRS- State of Iowa and said payments were never sent. The impacts of these actions left me in a position with the appearance of "paid in taxes that, in fact, were never paid". Resultant problems for me were personal tax obligations, professional corporation obligations and much later discovered, a tax fraud involving massive withholding taxes. Funds were withheld that were not paid to the IRS or the State of Iowa.

I remind the court that in late March of 2004, it was I who discovered dozens of certified registered letters from the IRS and Iowa Internal Revenue Service, that were hidden inside a large folder of bound print outs. All were unopened and had been

2

wedged into the bindings of a very large and heavy print out. It was a Sunday and I was consolidating records preparing for our office move on April 1, 2004. While lifting this heavy print out and rotating it for the moving van, all these unopened registered letters fell out onto the floor. I immediately: 1) signed and dated each one and put the time I opened each one on the envelope and on the first page, top right corner, 2) I totaled each letter and the amounts due, 3) I collated all into total numbers of monies for each type of taxes due. I was there all night and at 8:01 a.m. the next day, I called the Cedar Rapids office of the IRS and spoke directly to Mr. Arnold Stevenson (chief agent). I identified myself, my corporation and provided to Mr. Stevenson all legal descriptions tax ID numbers, my social security number, name, DOB, address, several phone numbers and the totals I mentioned.

    As I spoke with Mr. Stevenson, I asked him, as I've asked myself…"How could all these letters, some years old, be in my office and I had never seen them (though I did not handle the mail)." How was it possible to receive so many and I had never been contacted by any IRS agent, by phone, email or in person? I told Mr. Stevenson of the state tax issues and assured him I was going to call the State of Iowa Department of Revenue as soon as my call with him was finished. After checking his computer, he seemed as surprised as I that I had never been contacted by the IRS.

    This was late March 2004 Mr. Weidler waxes eloquent of taxes owed; his numbers profoundly wrong and he did not even bother to mention this finding at all: The frauds as recorded above and my profound withholding tax obligation as noted above. My actions were dictated by Mr. Ronald Mountsier and a regional IRS agent with whom

3

I was repeatedly included in conference calls to discuss: 1) where should all discretionary monies be paid? They were to be used to pay old tax withholding obligations. Money earned was sent to Ronald Mountsier, 2) first and always and very clear to me, the withholding taxes were withheld and not paid. Even though I was completely unaware of this fraud, it is notable that no individual-IRS, Iowa Revenue-no official ever suggested, nor was I ever told by any one during the pendency of the next several years that any one though I was in any way asserted to have acted in or ever intended to appear to have acted in an untrustworthy or illegal manner. By law,

I was strictly liable for a "large trust portion" of the withholding taxes; I clearly understood that to be a personal debt, not a corporation debt. Yes there was the matter of the unpaid personal taxes as well, taxes that would have been known to me if my returns had been timely filed in 1998, 1999, 2000and 2001. All five years were presented at one time and I signed all five on October 10, 2003. Despite repeated calls, attempts, demands for appointments and as I informed Mr. Weidler. The advice of two additional business attorneys gave me some advice to force McGladreys to finish these returns. I did pay in some taxes and in some years a substantial amount was with held and paid in as per amended tax returns filed for years 1998, 1999, 2000, 2001 and 2002 were finally finished and I immediately signed and immediately filed that first possible date was October 10, 2003 for all five years.

Pam Hupe was the accountant assigned to my returns she started new in 1996. She was in convicted of tax fraud with yet another medical office in Cedar Rapids, IA and

received a ten year prison sentence. This fact was never shared with me by anyone of the McGladry firm, including Steven Boyd.

Mr. Weidler crisply worded and resounding in error on each and every statement made in paragraph one of the petition. Wrong on the numbers, please see the exhibits. Wrong and in another forum the libel and slander assertions as to my intent to act illegally to transfer funds or evade. He seems to have written these easily, but recklessly as well.

My tax counsel, Ronald Mountsier and more than one regional IRS agent directed me to apply all funds available to pay the withholding tax obligation first. Knowing and such was openly discussed in a conference call – it was now understood and I was advised by my counsel while in conversation with regional IRS agent. I used all monies I had to pay withholding taxes. Clearly most monies are spent only legally one time.

To the plaintiff and the accused, why Mr. Weidler relied nearly solely and singularly on ten years of personal check book registers and did not, would not contact my counsel as I had released and had not yet done so at my deposition. So I reaffirmed and reasserted his need to do so. He did not.

If one simply, carefully observes the tax returns, ledgers and balance sheets, Mr. Weidler will find himself more that simply "in error". I firmly believe and I believe the Court will as well. That Mr. Wiedler is afflicted by one or two conditions of mind: 1) He did not, does not get it! 2) He did not, does not care that he does not. And most alarming, the records of payments I made to the IRS, please see **page 7**

5

I did make a set of decisions to purchase for short term, later resale; rare coins and collectibles. The gain in value on resale would provide additional funds intended solely to yet a bigger payment that on just cash flow alone. A decision I made, a decision I am responsible for. A set of decisions made in desperate circumstances, yet ill and uninformed decisions and severe self judgment benefit hindsight. Mr. Weidler manages to be wrong yet again. One cannot willfully withhold a value, or even attempt to do so, when as I told him under oath now in writing. The coins and collectables were of such shameful small worth. There was no value to withhold. These my statements in deposition. While the checks were written as asserted, the bulk of the funds for those so unwise purchases came from two family members and a small inheritance, afforded to me subject of my mother's death. Mr. Weidler knows as I told him, that I reported this to the New York State Attorney General's office. The purchases were of such insufficient value I was cautioned to remove the rider for them from our home owner's insurance. And the business which I took the materials for appraisal urged simple sale, not even the expenditure of a detailed formal appraisal. All this forwarded to the New York Attorney General's office. Where Mr. Weidler got his information, I do not know. The basis for his assertion of the actual value of the coins is simply wrong. Mr. Weidler cites "conduct", "intent". Purpose such as intent to conceal, evade, defeat. He provides no information of how worthless coins were and I explained the worthlessness of the coins under oath at my deposition.

As noted my income was used to pay unpaid, but withheld withholding taxes and those payments were made under the direct supervision of my attorney (who will be a

witness) and a regional IRS agent. Mr. Weidler as well fails to tell the Court of other monies, infused from outside sources (I am not including here or speaking of my ill advised expenditures on coins that worthless). I refer to the following: 1) approximately $50,000 from Dennis Visser, the man who defrauded me in a business, the jury awarded me in 2006. The entire check was signed over to the IRS. 2) $25,000 from a small business fraud employee policy. The employee was Linda Hobart, the same Linda Hobart on Mr. Weidler's witness list. The full policy value of $25,000 was signed over as well to the IRS. 3) A near fatal cardiac arrest February 22, 2006. The office overhead disability monies, some $10,000 a month for one year. An unknown but large portion of this overhead disability payment went to pay taxes withholding taxes as well. 1) I married Linda Topp June 9, 2000. Without my knowledge, or permission, Lynda Topp Varner exhausted pre-marital investments (primarily the "Principal Company") retirement funds of many tens of thousands of dollars, Lynda paid knowing full well she was in no way required to do so. I do not know the full amount and she steadfastly refuses to so inform me. Perhaps Mr. Weidler can ask her about these voluntary contributions as he has renamed her as a witness. Even though he is fully aware of all the years she filed individual tax returns which were fully paid. With my future earnings liened, to pay the "trust portion obligation" not yet paid off completely. In part because of my months long treatment for cancer in July 2009. With cardiac arrest and other issues I missed more than two years work since 2006 and am currently searching for employment, Mr. Weidler in Paragraph 1 asserts in 2003 over $200,000 and in his multi hue bar graph he asserts delinquent income tax liabilities for 1998 through 2001 as of

petition date. A number of $326,000 may we review in brief the exhibits for years 1998 to 2002 as taxes owed.

1998--filed 10/03/2003–amount owed $48,592

1999 – filed 10/3/2003-amount owed $35,907

2000-filed 10/3/2003-amount owed $9,582

2001-filed 10/3/2003-amount owed $5,716

2003-filed 10/03/03-amount owed $9,241

$$\text{Total } \$109,038.00$$

Factoring in $248,000 of stolen disability money recorded by Mr. Boyd as income when it was actually non taxable disability income. How much lower would the tax liability have been?

By my total the tax bill is approximately 1/3 of that asserted by Mr. Weidler, yet it is large.

Credit cards and house addition.

Mr. Weidler relates both as abusive expenses, yet they are so interrelated that to which I testified in my deposition. Yes, an addition was started in early 2002. Before I knew anything at all of: 1) Tax fraud, 2) Withholding tax fraud, 3) Theft by employee, 4) And theft of approximately $248,000 of personal and overhead disability payments from 1998 to 1999.

I fell February 5, 1997 while in Chicago on a professional trip. The head injury resulted in surgery and lengthy recovery. My Northwestern Mutual insurance agent, Dennis Visser, one in the same I won the $50,000 jury verdict in January 2006 as noted

all $50,000 paid to the IRS. Mr. Dennis Visser was my business partner, my insurance agent, a neighbor and I thought a "friend". Our children went to the same schools and Varners and Vissers to the same church. After my fall in 1997 and follow up neurosurgery, Mr. Visser, my insurance agent, offered to "do the paperwork" which was a proper role of an agent. Civil litigation filed attempts to recover damages from: 1) Theft of 1997 to 1998-disability payments, 2) Insurance fraud, 3) Business fraud, 4) Identity theft, 5) Interference with my business employee, Linda Hobart. With suit timely filed a complicated fact pattern. Value some $2,500,000 all counts subject to treble damages. Before I could move through the suit I was forced to file bankruptcy.

Dennis Visser and wife, Karen Visser, and Northwestern Mutual Insurance, were all defendants in the civil litigation. In the absence of a hearing I was provided notice of and the Trustees Personal Statement to me when I accidently heard of the Visser/Northwestern Mutual attempt to purchase the suit. I called the trustee, Mr. Schlegal in Washington, Iowa. Without a hearing of any kind, the suit against the Vissers and Northwestern Mutual Life Insurance was purchased by Vissers and NML from Trustee Schlegal for $10,500. When I asked of the purchase by the tort feasor it should be barred under equitable estoppell doctrine purchase from of my day in court. Purchased the fruits of the crime. I reminded the trustee that the value of the suit could easily be higher than: 1) All non tax debts plus, 2) Personal tax liability, 3) Withholding taxes. The trustee admitted to me that he had not reviewed the petition. When I strongly requested that unless he did he could not possibly function as a trust agent for the value of the civil action as trustee for those I owed and taxes due. He had no answer. He never

9

returned any calls after the first and only was quiet, non-fluent and protested that he had written but had not delivered the checks. I asserted that he hold or destroy and, if necessary, re-write the checks later if the sale to the Visser's and Northwestern Mutual was after a proper and full investigation review. He hung up the phone and I was unable to get him to return my calls after. While hanging up the phone, he did tell me to call my bankruptcy attorney, which I did. My attorney's single hostile retort was, "What do you want me to do, bid against them?" Then he as well terminated his phone call. I could find out nothing and had no way to urge the Trustee to assure an independent evaluation of the suit. The final sale to the Visser's and Northwestern Mutual was for $10,500.00. The reason or origin for the sale amount, I have not a clue.

I had no capacity to follow through before bankruptcy. A heart attack in 2006, cancer in 2009 and then Chapter 7 and a "give away" of marked assets to the harm of those to whom the Trustee held the asset in trust.

My bookkeeper, Linda Hobart, from which I recovered $25,000 from her fraud. The McGladry accountant, Steve Boyd who took Pam Hupe's place. Tax return year 1998 had an entry as does year 1999 consulting income. In the 1998 return total $122, 514 and in 1999 consulting fees totaled $126,253. May the court please, neither entry was an account name in any bookkeeping system I used. In 1998 and 1999 the consulting income or consulting fees rubric is something I had never seen in my accounting system. Consulting service as provided by me and my professional practice and was always labeled legal revenue earned as a part of my private practice. That being forensic psychiatric. It is always fully blended in to my private practice.

10

If it please the court, Pam Hupe, was sentenced to ten years for tax fraud when the amended returns were filed. Finally, October 10, 2003, at the same time all at once urgent to get filed certainly complicated by the impact by my 1997 injury, a head injury with loss of consciousness. The theft of the payments mid 1997 to mid 1998 found their way in to my returns even though the personal disability, nearly $10,000 a month, was not taxable as premiums were paid never deducted. The overhead disability would have been taxable at the professional corporation level as part of corporation income. The addition of an additional $125,000 to years 1998 and 1999 of income would very adversely impact my tax liability.

If it pleases the court, how are returns to carry an October 8, 2002 envelope postmark when I did not sign them until October 3, 2003? Both returns 1998 and 1999 do carry a stamp date of October 15, 2003. "Received #9 Accounts Management Operations Such issues, such detail apparently of no merit to my Chapter 7 Bankruptcy Trustee or Counsel for defendant, Mr. Curtis Weidler.

Of concern to pro se council: Both Trustee and Counsel for USA refused to make note of, take note of or even mention. These issues, these officers of the court: these monies not income and I so informed or attempted to do so. As pro se, without assets, with my filed civil action against Visser and Northwestern Mutual sold to the tort feasors without knowledge of the facts or lacking sufficiency of review and knowledge.
A matter of marked concern to counsel pro se. Is this a matter that is or can be before the court? If pro se counsel were to ask the courts interest in these apparent issues, is counsel pro se risking offending the court by raising these issues of marked merit? Are not

matters of equity comingled at times and this forum at this time this case is not the trust function of the sale of assets surely to benefit those for who the Trustee is to actually function to protect?

Returning to the credit card expenditures and the house addition allegation of "Willfulness" "Conduct requirement as asserted by Mr. Weidler, fails again. Fails for counsel's ignorance of the facts, misstatements of the facts, or secondary to his profound misunderstandings.

The addition:

I decided to add a small addition to my home. My spouse, Lynda's, mother sold her home in LeMars, Iowa and moved in with us. The cost of the addition, as I explained at length to Mr. Weidler, was much, much higher than expected. This was because after the start of construction, a severe sub surface land fault- not known- not able to see physically until after full commitment to build the addition. The land fault, an area of extremely unstable sub soil stabilization would have severely damaged the home even if an addition was never started. The stabilization of the existing structure and as well the addition required, at discretion, of the County Inspector and Soil Engineer. (A) Deep T-Wall Support foundation structures. (B) A longer than desired addition foundation wall footing to connect to the said T-Walls. (C) Plus a heavy duty deck. None of which were in the original plans to tie the soil support structures to the existing house and thus as well to the addition.

These expenses, a requirement of Code and engineering, not a desire for a "bigger, better" addition. A required unforeseen expense to mend an unknown, unforeseen soil

fault. The approximate added cost was $150,000. It is imperative to factor in the understanding that if the fault had to be addressed. The said fault was remedied on a cost plus basis. No contractor would submit a bid. Not a fun time, but an expensive, fortunate discovery. This added expense was far beyond budget, but required if not we would have to abandon the home. So a large- longer deep walls of the addition intrinsic soil fault stabilization. All this occurred before in any fashion of tax issues, fraud or theft. Our cash flow was exhausted. A mortgage to fully pay for the addition plus the cost for the soil fault stabilization was secured. The time to finish clearly extended.

I had a credit score of approximately 800 plus a 30 year fixed rate of 4.75%. I had no limit credit cards for many years. I had never missed a payment, so the decision was to use two American Express Gold Cards and a Citi Bank credit card. I had- personally spoke to financial officers of each card. The majority of the said fault expenses were to be on credit card no longer than two months. The appraisal was finished, loan committed, but no funds dispersed. Day two in the three day waiting period, a personal tax lien was filed against me less than one full day before final funding of mortgage that would have paid for all plus reserve. The lien- no funding of mortgage- huge credit card debts-tax lien, impossible to find funding.

The credit card expenditures referred to in Mr. Weidler's brief were a massive effort that failed to pay off the soil fault causing credit card debt, not new purchases as I explained under oath. Mr. Weidler decided to engage another fictional line of expenditures.

Credit card debt-not covered by the mortgage that was not funded. Mr. Weidler again did not understand or did not listen or care to.

By far the biggest expense for my son Hayden, was for Behavior Health Treatment not covered by insurance but subjected by court order. One son 11 month stay at Sky Ranch for Boys, Sky Ranch, South Dakota. I am thankful for the court's assistance. The massive assistance provided my son a place for him to heal, go to school and gain coping skills to live a full life. An odd thing to be accused of "Transfer" to "deliberately chose to spend...." "discretionary expenditures...."

Family members

Seems Mr. Weidler did not read the record closely enough as he missed "Court ordered". Seems to be at odds with "discretionary"

Yes, I did for Christmas; purchase each son a leather dress coat and another, a flight jacket. Yes, I did purchase as a wedding gift, a plane ticket to Russia for my son and his new wife.

Expensive coffee – yes—a long term private purchase of coffee I provided to professional staff and some to patients at offices.

Yes—flowers—purchased privately, not corporation funds, for grieving patients and family and those hospitalized.

The art—yes—purchased by my spouse from her son's wife, an artist. The monies premarital assets.

The spa and travel late December 2008—yes—very shortly after Lynda's mother's death at age 96. Lynda, her daughter and her two girls spent one week a motel near her son in Tucson, Arizona. Would remind counsel, one's mother dies only once.

Pets—yes—four puppies over 11 years. Two puppies for myself. First euthanized because of a rare, terminal parathyroid disorder. Second —yes—for me during treatment for cancer, summer 2009. Yes, two puppies. One each for two granddaughters given on a certain birthdate. Gifted—yes—responsible for—yes, need to be honest with the court.

Dated: June 22, 2011

Respectfully submitted,

*(signature)*   06/23/2011

Attorney Pro Se
14 Brickwood Circle
Iowa City, Iowa 52240
Telephone: (319) 351-5441
Email: vernonpaulvarnermdjd@gmail.com